## SOMMER v PENNISI

### Case No. CL-90-4776-AH

Fifteenth Judicial Circuit, Palm Beach County

June 25, 1990

**APPEARANCES OF COUNSEL**

**Crystal S. Holjes, Esquire,** for plaintiff.

**Steven J. Rothman, Esquire,** Jones, Foster, Johnston & Stubbs, P.A., for defendant.

### OPINION OF THE COURT

ELIZABETH T. MAASS, Acting Circuit Judge.

THIS CAUSE came before the Court for Final Hearing June 18, 1990, with both parties present and well represented by counsel. Based on the evidence presented the Court makes the following findings of fact and conclusions of law:

Anthony Pennisi, Jr., purchased his home in Palm Springs, Florida, on February 15, 1965. At some point he placed a first mortgage on the property with Foster Mortgage Company which, according to Mr. Pennisi, was later subsumed by Metropolitan Mortgage Company. On March 30, 1987, Mr. Pennisi secured a loan from and gave a mortgage on his home to Gibraltar Moneycenter, Inc., in the original principal amount of $49,220.41, apparently using the proceeds to pay off the Metropolitan mortgage. On March 4, 1988, Mr. Pennisi was the victim of a serious mugging which rendered him unable to work for over five months. On April 6, 1988, he gave a second mortgage on his home and certain personality[sic] to Creditthrift of America, Inc., to secure a $5,000.12 loan, in order to try to work out of the financial difficulties imposed by his unemployment.

Mr. Pennisi stopped making payments to Gibraltar sometime in 1988. By early 1989 that mortgage was seriously in arrears. Though no foreclosure action had been instituted, Mr. Pennisi felt a great deal of pressure to bring the mortgage current. He began contacting other mortgage companies and banks in an effort to refinance his property. As part of that effort he telephoned Creditthrift and talked to Norman Sugrue about increasing his indebtedness to that company in order to pay off Gibraltar. Creditthrift did not advance any more money to Mr. Pennisi. However, Mr. Sugrue felt sorry for Mr. Pennisi and wanted to help him.

Mr. Sugrue saw an advertisement in the paper for Associated Consumer Enterprises ("ACE") indicating that it bought foreclosures. ACE is a sole proprietorship owned by Sandra M. Sommer. Mr. Sugrue telephoned ACE and arranged a meeting among Jane Silk, Ms. Sommer's agent in the transaction under review here, Mr. Pennisi, and himself. It was unclear from the testimony when or where this meeting took place. Mr. Sugrue testified it was in Hollywood while Mr. Pennisi thought it was in Ft. Lauderdale. Ms. Sommer's file indicated the initial meeting took place June 13, 1989, though Mr. Pennisi signed the first document, a Sales Contract later superseded, on July 5, 1990. In any event, it is clear those three parties met to review what Ms. Sommer, a licensed mortgage broker and a licensed real estate broker, described as a "unique program" designed by her to help people about to be foreclosed upon.

Under this program, as described by Ms. Sommer to the Court, ACE would ostensibly purchase homes about to be foreclosed upon for the amount of the outstanding mortgages, arrearages, and closing costs, paying the bulk of the purchase price by assumption of the outstanding mortgages. The original homeowner would receive nothing at closing.

198

Ms. Sommer, as ACE, would pay out of pocket only mortgage arrearages and closing costs. Contemporaneously with the "sale" the parties would enter into a five year lease allowing the original home-owner, nominally as tenant, to remain in possession.

The monthly rent under the lease was computed by ACE by adding together the monthly mortgage payments to be assumed by ACE, prorated property taxes, arrearages and closing costs prorated over the five year term, and ACE's "profit". The lease gave the original owner the option to "repurchase" the property at the end of the five year term for the aggregate of the monthly lease payments, subject to the same mortgages in place at the time of the original sale to ACE, provided there were no defaults under the lease.

Though not a model of draftsmanship, the lease apparently contem-plated that the original owner would merely reassume the mortgages. The nominal "purchase price" equalled the aggregate of the 60 months' "rent". Under the form lease as structured, then, no money would change hands on "repurchase" by the original homeowner; the home-owner would merely receive title back, subject to the same mortgages which encumbered the property at the time of transfer to ACE.

The lease form typically supplied by Ms. Sommer, and actually used herein, contained a number of terms extraneous to the deals as structured. For example, ACE was required to "deliver the leased premises and all common areas in a clean, safe and sanitary condition, free of rodents and vermin and in complete compliance with all applicable laws"; in reality, ACE never had access to the houses prior to closing. The form lease had a lengthy security deposit provision, though no deposit was given. The form lease recited an option "purchase price" equal to the aggregate lease payments, though noth-ing explained the parties' actual intentions that all lease payments would go towards payment of the purchase price. The form lease contained a term which allowed ACE to postpone the homeowner's possession "(i)f on the date of this lease another person is occupying the premises," an obviously inapplicable provision. The lease required ACE to certify that any required smoke detectors had been installed and were in working condition "prior to Tenant's occupancy". Para-graph 13, "Destruction", which dealt with termination of the lease upon destruction of the premises, made no attempt to integrate the repurchase option. Suffice it to say, in summary, that the form lease used by Ms. Sommer was not tailored to the contemplated transaction.

Ms. Sommer testified that it was her belief that the lease permitted her to refinance the property at will, even increasing the principal

199

amount of the mortgages secured by the property. Under Ms. Sommer's interpretation the original homeowner would be required to assume whatever mortgage she placed on the property in order to exercise his "option". The Court is not at all convinced that the form lease so provided. In any event, Ms. Sommer clearly contemplated that the original homeowner would merely retake title and reassume the existing mortgage at the conclusion of the five year term.

Ms. Sommer testified that the sales contract and lease were typically entered into before closing in order to get some sort of "commitment" from the homeowner before ACE started incurring closing expenses. The sales contract was at times "revised" to reflect actual mortgage pay off figures when those figures were received by ACE pursuant to a release signed by the homeowner at the initial meeting.

Ms. Sommer testified that she entered into this type of transaction, of which there were nine, only if there was sufficient equity in the home to serve as "security for the lease." No credit check was run on the homeowner, and efforts to verify employment were minimal. She testified, further, that it was never her intention to take possession of the houses she ostensibly purchased. The program served as an investment vehicle for her. There was no negotiation of the purchase price; the price was arrived at by working backwards from the amount of the outstanding mortgages, though Ms. Sommer testified that on one or two other occasions she had actually advanced some money to homeowners at closing when asked.

Mr. Sugrue testified that the contemplated transaction was explained to Mr. Pennisi by Jane Silk at their initial meeting. Mr. Pennisi, an unsophisticated man with a 10th grade formal education, testified that much of the discussion took place outside of his presence. He further testified that he never read any of the documents he signed and that he believed he was refinancing, not selling, his property. It was not apparent that he ever communicated this belief to Ms. Sommer or her agent, however.

At some point following the initial meeting, Jane Silk, as Ms. Sommer's agent, received the Gilbraltar and Credithrift mortgage pay off figures of $48,825.54 and $4,270.70, respectively. After a "drive by" by Ms. Silk, who reported that the neighborhood surrounding the house was decent and that Mr. Pennisi had made some additions to the house, Ms. Sommer estimated the property's fair market value as $70,000.00 to $90,000.00. Upon realizing that Mr. Pennisi had approximately $12,000.00 to $32,000.00 equity in his house, Ms. Sommer decided to complete the deal.

200

On July 5, 1989, Mr. Pennisi executed a Sales Contract which recited a $48,820.00 purchase price. That price was apparently arrived at using mortgage pay off figures supplied by Mr. Pennisi at the initial meeting. On July 31, 1989, this transaction closed. That day Mr. Pennisi signed another Sales Contract, this one reciting a $60,525.11 sales price, recomputed once actual mortgage pay out, arrearages, and closing costs were known; a Warranty Deed, showing a documentary stamp tax paid commensurate with a $59,500.00 purchase price and bearing the Clerk's stamp reflecting reported consideration of $55,440.21; a bill of sale for certain personalty; an Acknowledgement and Affidavit addressing post-closing pro-rations; a Seller's Affidavit; and a five year Lease. The settlement statement, prepared by Union Title Corporation as closing agent, listed a $59,788.55 contract sales price. The discrepancy between the price recited in the Sales Contract, the price used to compute documentary stamp tax owed, and the price used in the settlement statement was never explained. The settlement statement showed a $6,343.97 assumption fee charged to Mr. Pennisi at closing which actually represented arrearages on the Gilbraltar mortgage.

As was Ms. Sommer's customary practice, paragraph 3 of the five year Lease gave Mr. Pennisi the option of "repurchasing" the property at the end of the Lease term upon assumption of "1st and 2nd mortgage balances at the time of the delivery of the deeds." The Lease called for a monthly rental of $908.09. That figure, aggregated over sixty months, yielded the stated option "purchase price" of $54,485.40. Ms. Sommer testified that, as was her practice, the $908.09 figure was computed by adding together the monthly mortgage payments and prorated real estate taxes, closing costs, and arrearages, together with a "profit" component. As discussed earlier, the lease form supplied by Ms. Sommer and used here was not tailored to this transaction.

After closing, Ms. Sommer contacted Gilbraltar and Credithrift in an attempt to assume those two mortgages. Gibraltar refused to allow Ms. Sommer to assume Mr. Pennisi's mortgage. She eventually paid off that mortgage for $49,367.94. Ms. Sommer never formally assumed the Credithrift mortgage. John Avogardo, Credithrift's branch manager, testified that Credithrift's books still showed Mr. Pennisi as the mortgagor on that mortgage at the time of trial. Indeed, Mr. Avogardo had had a telephone conversation with Mr. Pennisi in August of 1989, after the closing, concerning a late payment. A note in Mr. Avogardo's file did indicate, however, that Ms. Sommer should be contacted concerning the mortgage.

Unfortunately for Mr. Pennisi, he went into arrears on his "Lease"

**201**

payments. Ms. Sommer instituted this action to evict him, as a tenant, from the premises on March 6, 1990. Mr. Pennisi counterclaimed seeking a declaratory judgment that the parties' transaction actually constituted a mortgage which must be properly foreclosed. Certain other claims by Mr. Pennisi attacking the validity of the claimed mortgage were severed from trial of the right of possession.

At trial, Ms. Sommer proved that Mr. Pennisi was six months in arrears on his payments, totalling $5,448.54. Ms. Sommer had a private company serve the 3-day delinquency notice. No representative testified concerning service of that notice, which Ms. Sommer could not independently prove.

The issue involved in this case can be simply stated: did the transaction between Ms. Sommer and Mr. Pennisi constitute a sale and lease back, or did it constitute a mortgage designed as a sale in order to facilitate removal of Mr. Pennisi on default and deprive him of both his equity in the house and his equity of redemption?

Mr. Pennisi testified that he believed he was getting a mortgage. He told the Court that he did not find out that he had actually lost ownership to his house until early 1990, when a representative of a company trying to sell him new windows told him he was no longer record owner. He also testified that the documents were "thrown" at him to sign at closing. It is apparent to the Court, though, that while Mr. Pennisi may not have understood the terms of the documents he signed, no one prevented him from reading the documents or retaining professional help prior to execution. Therefore, Mr. Pennisi is bound by the terms of the documents he signed. *Merrill, Lynch, Pierce, Penner & Smith, Inc. v Benton,* 467 So. 2d 311 (Fla. 5th D.C.A. 1985). The crucial question is, though, whether the documents taken together establish an absolute conveyance, lease, and repurchase option, or a five year loan secured by the house.

Florida Statutes Section 697.01(1) provides:

All conveyances, . . . bills of sale or other instruments of writing conveying or selling property, either real or personal, for the purpose . . . of securing the payment of money . . . shall be deemed and held mortgages, and shall be subject to the same rules of foreclosure and to the same regulations, restraints and forms as are prescribed in relation to mortgages.

In construing the documents the parties' intentions control. "Intentions" refers to the intentions manifested by word or deed, not secret, undemonstrated intentions. Here, the clearest indication of the parties' intentions is the terms of the documents they signed. Mr. Pennisi kept

202

any other intention to himself. Ms. Sommer's intention, as explained to the Court, was embodied in the documents.

Deeds are presumed correct as written. *Barr v Schlarb,* 314 So. 2d 609 (Fla. 1st D.C.A. 1975). "No proposition could be more logical than that an instrument is what it says it is and appears to be." *Id.* at 610. However, the Florida courts have liberally construed Florida Statutes Section 697.01 to include arrangements styled as absolute conveyances, where shown either by testimony or by examination of contemporaneous transactions that the deed served merely as security for payment of a debt. *See, e.g. Connor v Connor,* 59 Fla. 467, 52 So. 727 (1910) (facially absolute deed found to be mortgage); *Gollnick v Barker,* 114 So. 527 (Fla. 1927) (same); *Thomas v Thomas,* 96 So. 2d 771 (Fla. 1957) (same); *Walker v City of Jacksonville,* 360 So. 2d 52 (Fla. 1st D.C.A. 1978) (same). A recitation in a deed that it represents an absolute conveyance and not a mortgage is not determinative. *Connor v Connor,* 59 Fla. 467, 52 So. 727 (1910).

Here, the parties clearly intended, as the terms of their writings and the economic effect of their transactions indicated, that Mr. Pennisi would make a series of 60 equal monthly payments to Ms. Sommer. If Mr. Pennisi made each payment he would walk away from the deal as if it had never taken place. If he defaulted in his payments Ms. Sommer would take his house. It is difficult to imagine how this transaction, stripped of legal titles and denomination of the parties as "buyer", "seller", "landlord", and "tenant", could be construed other than as a mortgage. Ms. Sommer herself testified that she looked to Mr. Pennisi's equity "as security for the Lease," meaning security for payment of 60 installments of rent due her under the Lease. What the parties have structured is a reversion to prior practice where a mortgage represented a conveyance of a defeasible interest in property rather than a lien. The Florida legislature enacted the statutory section currently numbered as Florida Statutes Section 697.01 to prevent the very type of abuse present here. *See Hoffman v Semet,* 316 So. 2d 649 (Fla. 4th D.C.A. 1975). There is virtually no economic distinction between the transaction under consideration and an agreement for deed. If an agreement for deed constitutes a mortgage, which it does, so does the current arrangement. *Id.*

Ms. Sommer has cited *Rosenthal v LeMay,* 72 So. 2d 289 (Fla. 1954) and *Woodmen of the World Life Assurance Society v Knudsen,* 275 F. 2d 440 (5th Cir. 1960), to the Court in support of her position. Both cases are distinguishable. In *Rosenthal,* the appellee sold his one-half interest in property co-owned with the appellant for $40,000.00, subject to an option to repurchase two years later for the same amount,

**203**

less estimated rents and interest. Unlike here, the purchase price apparently was negotiated between the parties and money actually changed hands. Exercise of the repurchase option required payment of the purchase price. Further, the appellee retained no continuing rights in the property for the two years between its sale and repurchase. In *Woodmen* there was no arrangement for the nominal tenant to repurchase the property, a fact dwelled on by the trial court. *Id.* at 412-413.

The Court does not ascribed[sic] to Ms. Sommer by her participation in this transaction any motive other than the desire to make a profit. However, she has found herself a victim of the old adage that if something sounds too good to be true, it probably is.

Based on all of the foregoing, it is

ORDERED AND ADJUDGED that Plaintiff shall take nothing by her action and Defendant shall go hence without day. It is further

ORDERED AND ADJUDGED that the Warranty Deed recorded at Official Record Book 6149, Page 596, Public Records of Palm Beach County, Florida, Bill of Sale, Acknowledgment and Affidavit, Seller's Affidavit, Lease, and Sales Contract referred to in this Final Judgment and marked as Plaintiff's Exhibits 2 through 6 and Defendant's Exhibit 1 are, taken together, hereby declared to be a promissory note and mortgage within the meaning of Florida Statutes Section 697.01; and Anthony Pennisi, Jr., is hereby declared to hold fee simple title to that real property more particularly described as:

Lot 25, Block 90, Village of Palm Springs Plat Number One, according to the Plat thereof as recorded in Plat Book 25 at Page 40, of the Public Records of Palm Beach County, Florida;

It is further

ORDERED AND ADJUDGED that the Court reserves jurisdiction to entain[sic] an award of attorney's fees to the prevailing party in this action and to consider all other issues properly raised, including those issues raised by Defendant's Counterclaim but severed from trial in this action by virtue of the Court's Order of June 12, 1990.

DONE AND ORDERED in West Palm Beach, Palm Beach County, Florida, this 25th day of June, 1990.